

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF: | FILED UNDER SEAL |
| ONE APPLE IPHONE MODEL A1897, IMEI 358630091709628; AND | MISC. NO.    19 - 2 4 2 3 JMC |
| ONE CRICKET ALCATEL MODEL 4044C, IMEI: 014896003173684 | |

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR A SEARCH WARRANT

Your affiant, Special Agent Francisco M. Rego of the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby deposes and states as follows:

### INTRODUCTION

1.      Your affiant submits this affidavit in support of a search warrant that would authorize the search of the following electronic devices that were seized during the arrest of Jebriel ALI a/k/a "Bril" on May 21, 2019:

    a.   Apple iPhone, Model A1897, IMEI 358630091709628;

    b.   Cricket Alcatel, Model 4044C, IMEI: 014896003173684.

2.      The above-described electronic devices are also described in Attachment A and collectively referred herein as the "SUBJECT ELECTRONIC DEVICES." The SUBJECT ELECTRONIC DEVICES are currently in the custody of the FBI Baltimore Division within the District of Maryland. The SUBJECT ELECTRONIC DEVICES remain the same, or substantially similar condition, as when they were first seized by law enforcement officers. The information sought to be obtained from the authorized searches, and the protocols to be followed in conducting the searches are set forth in Attachment B.

CLERK, U.S.
DISTRICT ...
BY

## AFFIANT EXPERIENCE

19 - 2 4 2 3 JMC

3.      I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516.   I have been a Special Agent with the FBI since July of 2017.   Since May of 2018, I have been assigned to the FBI's Safe Streets Task Force (BA SSTF) in Baltimore, which investigates violations of federal drug and firearms statutes. I have been responsible for investigations involving unlawful activities to include drug smuggling/trafficking, firearm offenses and violent crime occurring in the District of Maryland.   I have authored, executed, and/or participated in search and seizure warrants for illegal narcotics and related paraphernalia. I have arrested and/or participated in the arrest of over 20 persons for violations of state and federal narcotics statutes and have received specialized training in the area of illegal narcotics.

4.      I am familiar with the language, terminology, and street slang used by persons who purchase and distribute controlled dangerous substances ("CDS.")   I am also familiar with the prices and packaging and paraphernalia used to distribute and manufacture CDS. I have surveilled numerous narcotics transactions on the streets of Baltimore City and within the Baltimore metropolitan area.

5.      I have interviewed confidential informants, cooperating witnesses, street level, mid-level, narcotics distributors/traffickers, and narcotics users. This has provided me with an intimate insight into drug trafficking patterns.   I am also familiar with the counter-surveillance techniques utilized against law enforcement by drug traffickers.

6.      I am familiar with the violence associated with individuals involved in narcotics trafficking organizations. Individuals in these organizations are known to possess firearms for

2

19 - 2 4 2 3 JMC

protection of themselves and their drug products. These individuals are also known to retaliate against other narcotics distribution organizations due to loss of product or distribution territory.

7.      Additionally, based on my training and experience and participation in multiple narcotics investigations, I know the following: that it is common for drug dealers to "front," or provide on consignment, controlled substances to their customers; that it is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence, vehicles and/or their businesses for ready access; to conceal proceeds from law enforcement authorities and rival narcotics traffickers; that drug dealers routinely use cellular telephones and other electronic communication devices to facilitate their drug distribution operations; that drug dealing is an ongoing process that requires the development, use, and protection of a communication network to facilitate daily drug distribution; that drug dealers use telephones to thwart law enforcement efforts to penetrate the drug dealers' communication networks; that narcotics traffickers frequently transmit to one another prearranged numeric code, specifically to indicate the quantity and/or price of narcotics, or a predetermined code to identify the caller or meeting location, and that narcotics traffickers commonly use "coded" language when speaking with other drug traffickers in order to thwart detection by law enforcement agents who may be intercepting their communications; that narcotics traffickers may routinely "drop," or discard, their cellular telephones or other communication devices in an effort to thwart detection by law enforcement agents who may be intercepting their communications. I also know that narcotics traffickers frequently use multiple telephones to conduct business—for example, using one telephone to speak to customers, and another to speak to suppliers.

8.      Because this affidavit is being submitted for the limited purpose of establishing

3

probable cause for the search of the SUBJECT ELECTRONIC DEVICES, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law enforcement officers and other individuals. All conversations and statements described in this affidavit are related in substances and in part unless otherwise indicated. Summaries and descriptions, including quotations, of recorded conversations are based on my review of the audio recordings. Because this investigation has relied upon the interception of wire and electronic communication over cellular telephones, I have included my interpretation of those communications throughout this affidavit, and in some instances have placed in brackets my "translation" of the words or terminology used. These interpretations, as well as my opinions contained herein, are based upon my training, experience, knowledge of drug trafficking organizations ("DTOs") in general, and of this particular DTO's operations.

## PROBABLE CAUSE

## BACKGROUND OF INVESTIGATON

9.      On or about August 2018, the FBI began an investigation of multiple drug traffickers operating in and around Baltimore City. Based on evidence gathered to date through this investigation, investigators identified ALI as a narcotics trafficker in Baltimore Maryland. During the course of the investigation, federal investigators have conducted wiretap monitoring over cellular phones used by members of the conspiracy at issue in this case, including the following cellular phones: (443) 743-4501 (hereinafter "Target Telephone 1"), (443) 931-6317 (hereinafter "Target Telephone 2"), both used by ALI (as well as other Target Telephones used

4

19 - 2 4 2 3 JMC

by ALI and/or members of this conspiracy, but not necessary for inclusion in this affidavit).

## EVIDENCE OF DRUG TRAFFICKING

10.     On January 31, 2019 members of the FBI Baltimore Safe Streets Task Force
(BASSTF) conducted a controlled purchase of what was suspected at the time to be heroin from
ALI. Investigators utilized a confidential human source (hereinafter, "CS-1"[1]) to conduct the
heroin purchase. Prior to the heroin purchase, investigators utilized CS-1 to conduct a controlled
call to ALI, with the speaker function enabled and investigators listened to the conversation and
confirmed the CDS purchase location. ALI told CS-1 to meet him on Tremont (North Tremont
Road, Baltimore, Maryland) in the parking lot of the Hunting Hills/Mallow Hill Apartment
Complex, located at 4601 Pen Lucy Road, Baltimore, Maryland. Prior the purchase, investigators
searched CS-1 and found CS-1 to be free of contraband. During the controlled buy, investigators
conducted surveillance and observed ALI approach CS-1's vehicle from the apartment building
located on the west side of the apartment complex. The entrance to the parking lot intersects at
North Tremont Road and Sayer Avenue, Baltimore, Maryland. CS-1 purchased approximately 35
grams of what was suspected at the time to be heroin from ALI.   Upon completion of the
purchase, investigators observed ALI exit CS-1's vehicle and enter his own vehicle. It should be

---

1       CS-1 is registered with the BPD and provided intelligence to BPD since 2009. CS-1's
criminal record includes convictions for CDS possession non-marijuana, CDS possession with
intent manufacture/distribution, conspiracy armed robbery, conspiracy CDS common nuisance and
CDS distribution. CS-1's information has been corroborated to the extent possible and has been
found to be both credible and accurate. CS-1's information has led to the numerous seizures of
controlled dangerous substances and firearms. In December 2018, CS-1 was arrested for possession
of CDS and the case is still pending, no consideration for the recent arrest has been provided based
on CS-1's cooperation with law enforcement. However, CS-1 does receive monetary compensation
for his/her information. Although any criminal activity by CS-1 would be a breach of his/her
cooperation agreement with FBI, investigators do believe that the information previously provided
by CS-1 has been credible.

noted that subsequent lab analysis has revealed that the substance purchased from ALI by CS-1 was not heroin, as originally suspected, but Tramadol, a Schedule III controlled substance.

11.     On February 2, 2019, at approximately 3:31 PM, ALI received a call on Target Telephone 1 from an unidentified male using telephone number (410) 220-9967 (UM9967). Below is the transcription of the conversation:

UM9967:     Hey about to pull in there uhh **its gonna be a fifty.**

ALI:           Ok pull all the way to the back where the car wash is. You'll see my car running.

UM9967:     Alright. You come to me cause don't know what's goin on in there.

ALI:           No you gonna see. You gonna see the car.

UM9967:     Ok.

(emphasis added).     Based on my training, knowledge, and experience, I believe ALI conducted narcotics trafficking and used his car to facilitate the activity. I believe when UM9967 told ALI that "it's gonna be a fifty," ALI referred to a pack of 50 gel caps containing heroin.

12.     On February 2, 2019, at approximately 11:05 a.m., ALI received a call on Target Telephone 2 from an unidentified male using telephone number (443) 214-4102 (UM4102). Below is the transcription of the intercepted conversation.

ALI:           Yo.

UM4102:     Hey man. Where you at?

ALI:           I'm up the way. Where you at?

UM4102:     Say where?

ALI:           Where you at?

UM4102:     I'm on Wilkens Avenue.

**19 - 2 4 2 3 JMC**

| | |
|---|---|
| ALI: | What you wanted Bub? |
| UM4102: | **I want like four and a Dove**. I don't know if my son want some. I don't know what he wants yet. Hang on. |
| ALI: | Huh? |
| UM4102: | I have to see what he wants. |
| ALI: | What? |
| UM4102: | Three? Alright. Are you there? |
| ALI: | Yeah. What you want brah? |
| UM4102: | **I want let's see. Give me six and a Dove.** |
| ALI: | Alright listen though. **I'm capping it up right now just give me like 10 minutes. I'm already here though.** |
| UM4102: | Alright. I mean a real. A real... |
| ALI: | Yeah a real. 10 minutes bro. 15 at the most. Real ones. I'm capping it up right now. |
| UM4102: | 45 after 11. |
| ALI: | Alright come on. Meet me... |
| UM4102: | I'm right here man. |
| ALI: | Meet me at the spot in 10 minutes bro. |
| UM4102: | Ok. |
| ALI: | Alright. |

(emphasis added).   Based on the investigation and my training, knowledge, experience, I believe ALI engaged in narcotics trafficking with UM4102. During the intercepted conversation, investigators could hear in the background of the call a shuffling sound consistent with the use of

quick cap trays. I know based on my training, knowledge, and, experience that quick cap trays are used to package heroin into gel caps for distribution. Based on the call, ALI stated to UM4102 that "I'm capping it up right now," which I believe is a reference to packaging or "capping up" heroin in gel caps. When UM4102 asked ALI for "six," I believe UM4102 asked for six gel caps of heroin and ALI acknowledged the request.   On that same date, there were additional calls between ALI and UM4102 during which it appeared that the two were discussing time and location as if making arrangements to meet.

13.    On February 27, 2019, at approximately 7:42 p.m., ALI received a call on Target Telephone 2 from an unidentified female using telephone number (443) 538-6220 (UF6220). Below is the transcription of the intercepted conversation:

| ALI: | Yo. |
|------|-----|
| UF6220: | Hey are you around? |
| ALI: | What you need? |
| UF6220: | Um, can you do a **40 on a girl**? |
| ALI: | Yeah come on. This Nicole? |
| UF6220: | Yeah. |
| ALI: | Yeah I got you. Come on babe. Alley behind the school. |
| UF6220: | Behind the school? |
| ALI: | Yeah. |
| UF6220: | Okay. Be there in a few minutes. |
| ALI: | Aight. |

(emphasis added). Based on my training, knowledge, experience, and content of the intercepted communications between ALI and UF6220, I believe ALI engaged in the sale of narcotics to

8

19 - 2 4 2 3 JMC

UF6220 near Beechfield Elementary School in Baltimore, Maryland. The numerical "40" combined with the phrase "girl," which is a common coded term to refer to cocaine, appears to be a request for 40 units of cocaine, which ALl is willing to provide.

14.    On March 27, 2019, at approximately 8:34 a.m., ALI received a telephone call on Target Telephone 1 from an unidentified male using telephone number (443) 891-7153. UM7153 told ALI he would not be home but the door would be open, and he could go in and grab them.    Following that call, investigators witnessed ALI exiting a residence in the vicinity of the 400 Block of South Wickham Road and Cedar Gardens Road.    ALI was carrying a yellow plastic shopping style bag and entered his known Honda Accord.    At approximately 2:11 pm that same day, investigators witnessed ALI placing the same brightly colored yellow bag in a 2003 Acura 3.2CL bearing Maryland license tag 3DR1300.    ALI then closed the door and departed the area. Based on those observations and other information obtained during this investigation, investigators obtained a search warrant for the Acura.    Upon executing the warrant, investigators quantities of heroin, fentanyl, 2 ballistic vests, an M11 9mm, a Glock 19 handgun, an MDLPAP-M92PV 7.62mm rifle, a Sig Sauer 9mm handgun, and multiple rounds of ammunition.    The circumstances indicate that ALI was making use of the Acura as a stash location for drugs and guns.

15.    On April 15, 2019, at approximately 1:55 p.m., ALI received a telephone call on Target Telephone 1 from an unidentified male using telephone number (410) 892-6058. Below is the transcription of the conversation:

ALI:        Yo.

UM6058:        Yo what's up yo? Are you close?

ALI:        Yeah. What you need?

9

| UM6058: | Aight hey yo B. Aight look I got 20. I got 23. Can you do two? **Can you give me two Boys and a Girl yo**? |
| ALI: | Yeah I got you. Where we meet at? |
| UM6058: | Um right now I'm at my crib. |
| ALI: | Aight, about to pull up. |
| UM6058: | Aight. |

(emphasis added).   Based on my training, knowledge, and experience, I know that "girl" is a slang reference for crack cocaine, and "boy" is a slang reference for heroin. Accordingly, I believe that ALI was selling the unidentified male two gel capsules of heroin and crack cocaine for $23.00.

## EVENTS ON MAY 21, 2019

16.    During the course of this investigation, investigators intercepted numerous telephone communications where ALI discussed firearms and narcotics-related transactions with multiple individuals. Moreover, through physical surveillance and pole camera footage, investigators have observed ALI conducting suspected hand-to-hand narcotics transactions with individuals in the vicinity of Frederick Avenue and Collins Avenue in Baltimore, Maryland. Additionally, during the course of this investigation, investigators observed ALI depart his residence located at 225 North Calvert Street, Baltimore, Maryland in a silver Honda Accord Coupe, Maryland license plate 26249CH (hereinafter the "Honda") multiple times via physical surveillance, wire interceptions, and historical GPS data.

17.    On May 21, 2019, at approximately 9:29 a.m., investigators intercepted a telephone call on Target Telephone 1 between ALI and a male identified as "CHRIS," using telephone number 667-367-7239. Below is a transcription of the telephone call:

10

**19 - 2 4 2 3 JMC**

| | |
|---|---|
| CHRIS: | Yo. Hello? |
| ALI: | Yo. |
| CHRIS: | Yo where you at? You need to get up outside right now yo. |
| ALI: | What happened? |
| CHRIS: | Yo is down there by hisself it's just him and another n---a right now on Catherine bro. |
| ALI: | Who? |
| CHRIS: | Yo. Jean. |
| ALI: | Who? |
| CHRIS: | Whatcha callem bro. Who who when you had block (U/I) time out. |
| ALI: | Elgin? |
| CHRIS: | Yea bro he right thee he down his way on Catherine right now by hisself bro standing right there bro. |
| ALI: | What kind a car? |
| CHRIS: | I dont know I think it's a I think its a 4-door burgundy '07 right there they might be in and another (U/I) I saw right there it got tint on there bro. It's burgundy though. |
| ALI: | (U/I) till I get out there. |
| CHRIS: | Huh? |
| ALI: | You gotta go up there and see till I get down there. |
| CHRIS: | Aight. Aight. |

Call Terminated.

18.     Based on your affiant's knowledge, training, and experience, your affiant believes

FILED ENTERED
LOGGED RECEIVED

AUG 0 6 2019

AT BALTIMORE
CLERK U.S. DISTRICT COURT
BY DISTRICT OF MARYLAND
DEPUTY

11

19 - 2 4 2 3 JMC

that ALI received information from CHRIS regarding the presence of an individual on Catherine Street in Baltimore whom ALI intended to inflict violence upon. When CHRIS stated, "You need to get up outside right now yo," and provided a description of the vehicle to ALI, your affiant believes that CHRIS was urging ALI to leave SUBJECT PREMISES to inflict violence upon that individual.

19.     On May 21, 2019, at approximately 9:49 a.m., investigators intercepted a telephone call on Target Telephone 1 between ALI and an unidentified male (UM1291) using telephone number (410) 508-1291. Below is a transcription of the telephone call:

ALI:        Bro! Bro!

UM1291:     Whoodie what it is?

ALI:        Yo. I'm fucking calling you bro. Yo I'm rushing out the house right now I
            meant to just hit (U/I) the n---a on Catherine yo.

UM1291:     Oh my god I'm right here in court. I'm right here in the courtroom right now
            I'm a try to but Leavy right here with me yo. I'm bout I'm bout to tell uh Lil
            Hang (U/I) bout to be yo cause I'm right here downtown right now cause
            (U/I) bout to go to court so (U/I) be like 30 minutes. What what he shagging?

ALI:        Naw no he said the n---a was outside the car (U/I) make some money.
            Literally a n---a just hit me bro I'm bout to I'm bout to shoot down there real
            quick. .

UM1291:     Aight man man.

ALI:        So I'm a hit you and let you know I doubt its goin be the (U/I) standing right
            there **cause yo bitch ass goin (U/I) woke. You feel me?** When I get down
            there I'm a hit you bro.

| UM1291: | Aight aight. Hey yo dont yo dont yo remember when we was talking bout yesterday (U/I). At at the table tip on the on the on the (U/I) |
|---|---|
| ALI: | (U/I) |
| UM1291: | Yea. |
| ALI: | Yea. |
| UM1291: | Yea I said i said I got 'em through yo so whenever you ready son. |
| ALI: | Aww yea what you bout to go to court with Hayne? |
| UM1291: | Yea. |
| ALI: | Aight bet what time y'all goin be done? |
| UM1291: | Proably like an hour hour and a half. |
| ALI: | You already got a spot (U/I). |
| UM1291: | Yea hell yea hell yea (U/I). |
| ALI: | Already already shit then um shit () hit me when yall done. |
| UM1291: | Already. |
| ALI: | Already. |

Call Terminated.

Based on your affiant's knowledge, training, and experience, your affiant believes that UM1291 and ALI were discussing ALI's intent to inflict violence upon the individual referenced by CHRIS in the preceding paragraphs. When ALI stated, "Yo I'm rushing out the house right now I meant to just hit (U/I) the n---a on Catherine yo," your affiant believes that ALI intended to inflict violence upon an individual located on Catherine Street by saying, "Hit (U/I) the n---a on Catherine." Based on your affiant's knowledge, training, and experience, "hit" is a term often used in reference to an act of violence. Moreover, based on your affiant's knowledge, training,

13

and experience, it is common for narcotics traffickers to effect acts of violence against each other to eliminate competition or enforce their organization's territory.

20. Shortly after this telephone call, at approximately 10:30 a.m., the Honda was observed departing the parking garage located at the Honda via GPS tracking software. The Honda's position updates reflected a steady path towards the vicinity of Catherine Street and West Baltimore Street, Baltimore, as referenced in the telephone call. Investigators notified Baltimore Police Department (BPD) that ALI was proceeding towards the vicinity of Catherine Street and furnished BPD assets with a description of the ALI and the Honda.

21. Shortly thereafter, investigators and BPD assets observed the Honda in vicinity of Catherine Street and Warwick Avenue, Baltimore. At approximately 10:46 a.m., BPD assets attempted to conduct a traffic stop on ALI in the Honda in vicinity of McCurley Street and Old Frederick Road in Baltimore, Maryland. ALI did not stop when approached by BPD assets and fled from the Honda in vicinity of the 200 Block of McCurley Street, where he was apprehended in vicinity of the Sarah M. Roach Elementary School. Recovered from ALI's person during his arrest by BPD were the SUBJECT ELECTRONIC DEVICES.

22. While securing the Honda after ALI's arrest, BPD officers and investigators observed a pistol with an extended magazine in the map pocket in the passenger seat of the Honda.[2] Investigators obtained a federal search warrant for the Honda. During the resulting search, investigators recovered the following from the Honda: A red Apple iPhone, a black LG flip phone (to be clear, those were separate cellular devices from the SUBJECT ELECTRONIC

---

2    ALI was arrested on May 21, 2019 and on May 22, 2019 had his initial appearance in the United States District Court for the District of Maryland on a criminal complaint charging him with possession of a firearm by a previously convicted person in violation of 18 U.S.C. § 922(g)(1).

19 - 2 4 2 3 JMC

DEVICES of this application), a bag containing unused gel caps and three mannite bars, a black digital scale, a black container with suspected marijuana, and a loaded Glock 22C .40 cal firearm bearing serial number ABKH5777 with an extended magazine.

## USE OF CELLULAR PHONES IN DRUG-TRAFFICKING

23.     As discussed in the paragraphs above in connection with my professional background, I am familiar with the mode of operation of individuals who commit drug trafficking offenses, including, but not limited to, their use of electronic devices to plan and coordinate drug trafficking activities. Based on my knowledge, training, and experience, individuals committing drug trafficking offenses frequently use cellular telephones, communication devices, and other electronic media storage to further their illegal activities. Based upon my training, experience and participation in this and other investigations, I know the following:

24.     The fruits and instrumentalities of criminal activity are often concealed in digital form. Furthermore, digital camera technology is often used to capture images of tools and instrumentalities of pending criminal activity. All of the above cell phones have both digital storage capacity and digital camera capabilities.

25.     Individuals engaged in drug trafficking offenses often use cell phones to communicate with suppliers, to place orders with suppliers, to communicate with customers, to receive orders from customers, and to arrange meeting times and locations for the distribution of controlled substances. The individuals engaging in drug trafficking will often use a combination of voice calls and text messages to coordinate drug transactions. Individuals engaged in drug trafficking offenses also use digital storage devices to maintain telephone number "contact lists" of individuals who may have assisted in the planning of this and other criminal activity.

26.     Drug trafficking is an ongoing and recurring criminal activity. As contrasted with

crimes against persons, which tend to be discrete offenses, drug trafficking is an illegal commercial activity that is characterized by regular, repeated criminal activity.

27.     Cellular telephones are an indispensable tool of the narcotics trafficking trade. Narcotic traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators and narcotic traffickers. In addition, narcotic traffickers will often change their cellphones following the arrest of a member of their Drug Trafficking Organization ("DTO"), or at random in order to frustrate law enforcement efforts.

28.     Narcotic traffickers often place nominal control and ownership of telephones in names other that their own to avoid detection of those telephones by government agencies. Even though telephones are in the names of other people, drug traffickers retain actual ownership, control, and use of the telephone, exercising dominion and control over them.

29.     Drug traffickers utilize different types of communication devices, and change the numbers to these communication devices frequently. This is done to avoid detection by law enforcement personnel. I also know that drug traffickers will dedicate different communication devices for different aspects of the trafficking organization. An example of this would be a drug trafficker utilizing one cellular telephone to communicate with customers, and utilizing another cellular telephone to communicate with a source of supply of drugs.

30.     Cellular phones associated with drug traffickers include various types of evidence. Phones may contain relevant text messages or other electronic communications; they may contain electronic address books listing the phone numbers and other contact information associated with co-conspirators; and they may contain other types of information.

16

31.     The mere fact of a cellular phone's call number, electronic serial number or other identifying information may be evidentiary value as it may confirm that a particular cell phone is the phone identified during a wiretap, pen register, or other electronic investigation.

### FORENSIC ANALYSIS OF THE SUBJECT ELECTRONIC DEVICES

32.     Based on my knowledge, training, and experience, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. There is probable cause to believe that things that were once stored on the SUBJECT ELECTRONIC DEVICES may still be stored on those devices, for various reasons, as discussed in the following paragraphs.

33.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the SUBJECT ELECTRONIC DEVICES were used, the purpose of its use, who used it, and when.

34.     There is probable cause to believe that this forensic electronic evidence might be on the Device because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use.

17

19 - 2 4 2 3 JMC

Computer file systems can record information about the dates files were created and the sequence in which they were created.

35.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

36.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

37.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

38.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40.    Because this warrant seeks only permission to examine devices already in law

18

enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

41. During this case and in numerous others involving complex DTOs, investigators have learned that the drug-trafficking organization relies heavily on electronic devices to facilitate drug trafficking. It is necessary to conduct a physical inspection of the electronic devices in order to obtain electronic communications and other information that might be stored on the seized phones and to determine whether any of the seized phones were the subject of wiretap, pen register or other investigation detailed herein. The phones may also contain data and communications that were not electronically intercepted due to encryption or for other reasons.

42. Again, all of the SUBJECT ELECTRONIC DEVICES remain in the custody of law enforcement. The only known specifics of each phone requested for authorization to search are detailed in Attachment A and the types of information expected to be recovered from the devices are listed in Attachment B.

## CONCLUSION

43. Accordingly, there is probable cause to believe that evidence will be found from an analysis of the SUBJECT ELECTRONIC DEVICES recovered. The phones may contain records of ALI's most recent calls, which may include calls with persons involved in DTO. The phones may contain copies of SMS or text or other electronic communications relating to activities associated with the DTO. The phones may also contain a variety of other electronic evidence, including electronic communications through various cellular or internet-based applications, photographs and other information.

44. Wherefore, in consideration of the facts presented, I respectfully request that this

19

19 - 2 4 2 3 JMC

Court issue search warrants for the SUBJECT ELECTRONIC DEVICES, and authorize the search

and seizure of the items described in Attachment A, for the information set forth in Attachment B,

where applicable, which constitute fruits, evidence and instrumentalities of possession of a firearm

in furtherance of drug trafficking, in violation of 18 U.S.C. 18 U.S.C. § 924(c), as well as conspiracy

and drug possession with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846.

## REQUEST FOR NIGHT-TIME AUTHORIZATION

45.     There is good cause for the Court to authorize the requested searches at any time of

the day or night. The SUBJECT ELECTRONIC DEVICES are already in law enforcement custody,

and it is reasonable to allow law enforcement to execute the requested searches at any hour of the

day, even during the evening or night, if doing so is convenient for the investigators or examiners.

Because the devices are in law enforcement custody already, there is no prejudice to any other

person from this request.


Francisco M. Rego
Special Agent
Federal Bureau of Investigation

Sworn to before me this 22 day of July, 2019 at 3:42 hours

Hon. J. Mark Coulson
United States Magistrate Judge

FILED _____   ENTERED
LOGGED _____   RECEIVED

AUG 0 6 2019

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

20

19 - 2 4 2 3 JMC

## ATTACHMENT A – Devices to be Searched

Apple iPhone, Model A1897, IMEI 358630091709628

Cricket Alcatel, Model 4044C, IMEI: 014896003173684

ENTERED
RECEIVED
FILED
LOGGED
AUG 06 2019

DEPUTY

BY

**ATTACHMENT B**          19 - 2 4 2 3 JMC
**ITEMS TO BE SEIZED**

All records contained in the items described in Attachment A which constitute evidence of violations of 21 U.S.C. §§ 846 and 841(a)(1), as outlined below:

1.  Contact logs that refer or relate to the user of any and all numbers on the Subject Electronic Devices.

2.  Call logs reflecting date and time of received calls.

3.  Any and all digital images and videos of persons associated with this investigation.

4.  Text messages to and from the Subject Electronic Devices that refer or relate to the crimes under investigation.

5.  Records of incoming and outgoing voice communications that refer or relate to the crimes under investigation.

6.  Voicemails that refer or relate to the crimes under investigation.

7.  Voice recordings that refer or relate to the crimes under investigation.

8.  Any data reflecting the phone's location.

9.  Contact lists.

10. Any and all records related to the location of the user(s) of the devices.

11. For each of the Devices:

    a.  Evidence of who used, owned, or controlled the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b.  evidence of software that would allow others to control the Devices, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.  evidence of the lack of such malicious software;

    d.  evidence of the attachment to the Devices of other storage devices or similar containers for electronic evidence;

22

19 - 2 4 2 3 JMC

    e.  evidence of counter forensic programs (and associated data) that are designed to eliminate data from the Devices;

    f.  evidence of the times the Devices were used;

    g.  passwords, encryption keys, and other access devices that may be necessary to access the Devices;

    h.  documentation and manuals that may be necessary to access the Devices or to conduct a forensic examination of the Devices;

    i.  contextual information necessary to understand the evidence described in this attachment.

12. With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

    a.  surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

    b.  "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

    c.  "scanning" storage areas to discover and possible recover recently deleted files;

    d.  "scanning"   storage areas for deliberately hidden files; or

    e.  performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

13. If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.